## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DELFINO PEDROZA and LILIANA ANDRADE,

      Plaintiffs,

vs.                                   No. CIV 07-0591 JB/RHS

LOMAS AUTO MALL, INC.; M.D. LOHMAN d/b/a
LOHMAN MOTORS; WESTERN SURETY COMPANY; and
USAA CASUALTY INSURANCE COMPANY d/b/a USAA,

      Defendants.

LOMAS AUTO MALL, INC. and M.D. LOHMAN d/b/a
LOHMAN MOTORS,

      Third-Party Plaintiffs,

vs.

INDEPENDENT AUTO DEALERS SERVICE
CORPORATION, LTD. and NEW MEXICO INDEPENDENT
AUTOMOBILE DEALERS' ASSOCIATION, INC.,

      Third-Party Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Leave to Amend

Complaint, filed May 14, 2008 (Doc. 163)("Motion to Amend"); and (ii) the Motion for Partial

Summary Judgment on Salvage and Title Washing Claims, filed July 7, 2008 (Doc. 189)("Motion

for Summary Judgment").  The Court held hearings on July 8, 2008 and September 10, 2008.  The

primary issues are: (i) whether the Court should grant the Plaintiffs leave to file a Second Amended

Complaint; and (ii) the meaning of the phrase "considers it uneconomical to repair" in N.M.S.A.

1978 § 66-1-4.16(C).  As stated at the July 8, 2008 hearing, the Court will grant the Motion to

Amend.  Additionally, because the Court believes that the Supreme Court of New Mexico, if it were faced with the question, would not find that New Mexico's salvage law entails the use of a one-hundred percent rule, but would hold that New Mexico law relies on a determination that a damaged vehicle is uneconomical to repair, the Court will deny the Motion for Summary Judgment.

## FACTUAL BACKGROUND

The Plaintiffs bought a used 2005 GMC Sierra from Defendant Lomas Auto Mall, Inc., on December 29, 2006.  The Sierra had an eventful history, which the Plaintiffs allege included a salvage title and a damaged axle that was not disclosed to them.  The Sierra had been stolen from its original owner, Lori Buckner, in August 2006, but was soon recovered from the thieves in a damaged condition.  Defendant USAA Casualty Insurance Company d/b/a USAA, Buckner's insurer, took title to the Sierra in its settlement with Buckner.

The Sierra passed through various hands before finally being sold to the Plaintiffs.  When CoPart Auto Auctions applied for a title in USAA's name, the Sierra was first issued a salvage title, but the title was later changed to a clean title.  The reasons for that change are at the center of this dispute.  Lomas Auto Mall and M.D. Lohman d/b/a Lohman Motors (collectively, "Dealerships") contend that the salvage title was mistakenly issued because of a clerical error, and that the Sierra should have had a clean title from the start, while the Plaintiffs maintain that the salvage title was appropriate, but the Sierra's title had been "washed."

Many of the facts are undisputed.  Thieves stole Buckner's Sierra in early August 2006.  See Memorandum in Support of Motion for Partial Summary Judgment on Salvage and Title Washing Claims ¶ 1, at 2, filed July 7, 2008 (Doc. 190)("Memo. in Support").  Buckner made a claim to her insurer, USAA.  See id. ¶ 2, at 2.  Before the claim was settled, the Sierra was recovered on August 14, 2006, but was damaged.  See id. ¶¶ 3, 5, at 3.  USAA estimated the Sierra's book value to be

$25,950.00, paid the remaining balance on Buckner's loan, $26,544.50, and took title to the Sierra as part of the settlement.  See id. ¶¶ 6, 8-9, at 3.  The Dealerships maintain that USAA estimated that it would cost $13,133.00 to fix the Sierra, see id. ¶ 5, at 3, although the Plaintiffs contend that USAA's original repair estimate was lost and a new estimate was recreated, which is much lower than the original estimate, see Plaintiff's Opposition Brief to Dealerships' Motion for Partial Summary Judgment on Salvage and Title Washing Claims at 16, filed July 21, 2008 (Doc. 201)("MSJ Response"); Exhibit M to MSJ Response, Loss Report (Doc. 201-14).

After taking title to the Sierra, USAA sought to sell the vehicle, acting through CoPart. CoPart used Defendant Independent Auto Dealers Service Corporation, Ltd. ("IADSC"), a New Mexico Motor Vehicle Department ("MVD") fee agent,[1] to apply for a title certificate in USAA's name.  See Memo. in Support ¶ 11, at 3.  IADSC issued a salvage title.  The Dealerships contend that USAA authorized CoPart to apply for a clean title, see id. ¶ 10, at 3, while the Plaintiffs take the position that USAA, at least initially, instructed IADSC to obtain a salvage title, see MSJ Response at 17.  According to the Dealerships, the clerk at IADSC who was processing the title application accidently hit the "S" key on his keyboard while in a program, causing a salvage title rather than a clean title to be issued.  See Memo. in Support ¶ 14, at 4.  CoPart received the salvage title, dated October 13, 2006, but sent it back to IADSC, requesting a clean title.  See id. ¶¶ 15-16, at 4.  IADSC complied and issued a clean title dated October 26, 2006.  See id. ¶ 17, at 4.  CoPart then sold the Sierra in an online auction.  Lohman, the highest bidder, paid $13,300.00 for the Sierra, which was transferred to him on a clean title.  See id. ¶¶ 18-19, at 4.  The Sierra was later sold to the Plaintiffs, on a clean title.

---

[1] A fee agent for the MVD is authorized to issue title certificates on MVD's behalf.

## PROCEDURAL BACKGROUND

The Court has consolidated two motions for the purposes of this opinion. In the first motion, the Motion to Amend, the Plaintiffs seek permission to file a Second Amended Complaint adding IADSC as a Defendant and adding allegations concerning USAA's settlement of Buckner's insurance claim. The Court, for the reasons more thoroughly detailed below, has already orally granted the Plaintiffs leave to file their Second Amended Complaint. One of the issues raised in the context of the Motion to Amend, however, is intertwined with the central question in the Motion for Summary Judgment: the meaning of the phrase "considers it uneconomical to repair," and what the requirements are in New Mexico for a damaged vehicle being a salvage vehicle. In opposition to the Motion to Amend, the Dealerships argued that amendment to add claims against USAA would be futile because New Mexico law uses a one-hundred percent rule, under which the phrase "considers it uneconomical to repair" means that the cost to repair a vehicle equals or exceeds the vehicle's fair market value, and the Plaintiffs could not show that the one-hundred percent rule was satisfied. The Court decided that the Plaintiffs' proposed claims were not frivolous and that it did not need delve into the full intricacies of New Mexico titling law to decide the Motion to Amend, and granted the Motion to Amend at the July 8, 2008 hearing, but did not foreclose the Defendants re-raising the issue on full briefing. The Defendants re-raise their arguments on summary judgment, and the Court will consider them more fully and completely now.

### 1.     The Initial Complaint and Allegations Concerning Salvage.

This case began on June 19, 2007, when the Plaintiffs filed their original Complaint. <u>See</u> Complaint for Damages and for Declaratory Relief and Jury Demand, filed June 19, 2007 (Doc. 1)("Complaint"). The initial Complaint alleged that the Sierra had a salvage title when USAA sold it to Lohman Motors through CoPart Auto Auctions. <u>See</u> Complaint ¶¶ 10, 11 & 16, at 3. The

initial Complaint also alleged that the MVD issued a salvage title for the Sierra because the insurance company, USAA, declared the Sierra a total loss as a result of flood damage. See id. ¶ 18, at 3.

When the Plaintiffs filed their initial Complaint, they conformed their pleading to the wording of N.M.S.A. 1978 § 66-1-4.16(C)(1), the first prong of the statutory definition of "salvage vehicle." The Plaintiffs have always alleged that the Sierra should have been sold on a salvage title. See Complaint ¶ 1, at 1.

### 2.    The Third-Party Complaint.

IADSC has been part of this case since the Dealerships filed their Third-Party Complaint at the end of 2007. The Dealerships brought a claim against IADSC and now Third-Party Defendant New Mexico Independent Automobile Dealers' Association, Inc., alleging that the two were responsible for the Sierra being branded salvage and for later removing the brand, without telling the Dealerships. See Third Party Complaint by Lomas Auto Mall, Inc. and M.D. Lohman Against Independent Auto Dealers Service Corporation, Ltd. and New Mexico Independent Auto Dealers' Association, Inc. ¶¶ 10-20, 23, 3-4, filed December 31, 2007 (Doc. 58)("Third-Party Complaint"). The Dealerships thus asserted a right to indemnification if they were found liable to the Plaintiffs for having sold the Sierra on an undisclosed salvage title. See id. ¶¶ 21-24, at 4-5.

### 3.    The First Amended Complaint.

On February 4, 2008, the Plaintiffs filed their First Amended Complaint, adding another Defendant, USAA, on claims that it participated in a conspiracy to wash the Sierra's title. See First Amended Complaint for Damages and for Declaratory Relief and Jury Demand ¶ 1, at 1 (Doc. 91)("First Amended Complaint"). The First Amended Complaint dropped the explicit allegations that the insurance company, USAA, declared the Sierra a total loss because of flood damage.

Instead, the First Amended Complaint alleged that: (i) USAA took title to the Sierra after a theft recovery because USAA determined that it was not economical to repair the Sierra for the insureds, see id. ¶¶ 12, 14, 15, 16, 17, at 3-4; (ii) USAA nevertheless tried to sell the Sierra on a clean title through CoPart Auto Auctions, see id. ¶¶ 18, 19, at 4; (iii) meanwhile, the MVD declared the Sierra a salvage, see id. ¶ 20, at 4; and (iv) USAA pulled the Sierra from sale at auction until it could, via a conspiracy with Lomas Auto Mall and Lohman Motors, get IADSC to wash the MVD's salvage brand from the title and sell the vehicle on a clean title, see id. ¶¶ 21-28, at 4-5.

4.   **The Motion to Amend**.

The Plaintiffs move the Court to allow them to file a Second Amended Complaint, which would add IADSC as a Defendant and bring new allegations against USAA. The Plaintiffs argue that adding IADSC as a Defendant will not prejudice the Defendants. The Plaintiffs maintain that IADSC has been a party to the case since the Dealerships brought IADSC in, and that seven weeks of discovery remain, with many of the key depositions for IADSC already complete and no relevant dispositive motions pending. See Plaintiffs' Brief in Support of Motion for Leave to Amend Complaint at 3, filed May 14, 2008 (Doc. 164)("Plaintiffs' Brief"). The Plaintiffs also contend that adding IADSC is not an attempt to cure deficiencies, but that denying leave to amend would prejudice the Plaintiffs because of the possibility of the other Defendants staging an empty-chair defense. See id. at 3-4.

The Plaintiffs also argue that adding allegations against USAA would not prejudice the Defendants. The Plaintiffs state that only after receiving initial disclosures at the beginning of April 2008 did they realize that a factual basis existed for the Sierra being salvage because USAA handled Buckner's claim as a total-loss claim. See id. at 4-5. The Plaintiffs assert that the state of discovery and pending motions indicate no prejudice to the Defendants, and that there is no unfair surprise to

USAA because the Plaintiffs have always alleged that the Sierra warranted a salvage title.  See id. at 5.  Finally, the Plaintiffs contend that not allowing amendment would prejudice them, because they would not be able to bring forth all the facts to prove the Defendants' liability, while adding the second theory helps them to show they are entitled to punitive damages.  See id. at 6.

IADSC opposes amendment.  They argue that the Plaintiffs are unjustified in waiting until eight months after filing their Complaint and several months after deposing IADSC's principal witnesses to move to amend.  See Defendant's Brief in Opposition to Plaintiff's Motion for Leave to Amend Complaint at 2, filed June 2, 2008 (Doc. 170)("IADSC Response").  In particular, IADSC contends that the Plaintiffs were aware of their possible claims as early as December 2007, when the Third-Party Complaint was filed, which was before the Plaintiffs filed their First Amended Complaint.  See IADSC Response at 2-3.  IADSC also maintains that the Plaintiffs' conspiracy claim belies their assertion that the allegations in the First Amendment Complaint against USAA are unrelated to the claims against IADSC, indicating an attempt to cure deficiencies.  See IADSC Response at 3.  IADSC also opposes adding new theories of liability against USAA for similar reasons.  See id. at 4-5.

The Dealerships also oppose amendment.  The Dealerships devote the majority of their briefing to outlining their understanding of New Mexico law on salvage titles.  They argue that the relevant New Mexico statutes and regulations, read together, produce two tests for determining whether a vehicle should be branded with a salvage title.

According to the Dealerships, the first test is an objective, one-hundred percent test.  They argue that by itself, "NMSA 1978 §66-1-4.16(C)(1) . . . would sanction a process whereby salvage hinges on whether someone 'considers it uneconomical to repair' the vehicle."  Dealerships' Response at 8 (quoting N.M.S.A. 1978 §66-1-4.16(C)(1)).  They contend that this is subjective and

that the "needed objectivity is supplied by" the New Mexico regulations, which require a comparison of the cost of returning a vehicle to roadworthy condition with the fair market value of the vehicle; where the costs exceed value, the vehicle is salvage.  Dealerships' Response at 8.

The second test that the Dealerships propose involves an insurer declaring a vehicle to be salvage.  They argue that, under the second test, an insurer must make a total-loss payment and also notify the insured that the title will be branded salvage.  See id. at 9.  This scheme, they maintain, places the burden on the insurer, whose incentives are aligned with giving the insured as little as possible, to declare a vehicle salvage.  See id. at 10.  They further contend that this reading of the law finds support in the MVD forms required for obtaining a salvage title.  See id. at 11-12.

The Dealerships next survey the title laws of other states.  They argue that California's salvage regime is the closest to New Mexico's approach and that California courts have interpreted the phrase "considers it uneconomical to repair" in the California statutes to express a one-hundred percent rule.  Id. at 12-14.  They also list laws from a variety of other states that they contend allow insurers to use internal standards for totaling a car, but also have an overarching objective test that requires salvage branding in certain circumstances.  See id. at 14-15.  Based on this legal exposition, the Dealerships argue that the Plaintiffs' proposed amendments regarding USAA would be futile, because the amendments do not allege that the cost to repair the Sierra exceeded its value, but allege only that USAA treated the Sierra insurance claim as a total loss.  See id. at 19-20.

The Dealerships also argue that the Plaintiffs have unduly delayed their proposed amendments.  The Dealerships maintain that the Plaintiffs knew or should have known that the Sierra was treated as a total loss before they filed their original complaint, based on the MVD records they obtained before the lawsuit began.  See Dealerships' Response at 16-17.  They point out that the power of attorney allowing CoPart to act on USAA's behalf gave CoPart power over

"'***total-loss vehicles*** assigned to Copart by USAA,'" and that title transfers and power of attorney are consistent only with a total-loss settlement.  Id. at 17 (quoting Exhibit 3, Special Limited Power of Attorney (dated June 14, 2002)(Doc. 171-4)("POA"))(emphasis added by Dealerships' Response).  The Dealerships further assert that, before the First Amended Complaint was filed, a USAA representative spoke with Rob Treinen, the Plaintiffs' attorney, and explained that USAA did not declare the Sierra salvage because the damage to the Sierra did not exceed fifty-percent of the Sierra's value.  See Dealerships' Response at 18.  This conversation, the Dealerships maintain, put the Plaintiffs "on notice that whether the Sierra merited a salvage title due to a salvage vehicle declaration was a critical question."  Id.

Finally, the Dealerships argue that evidence that USAA treated the Sierra as a total loss is inadmissible under rule 403 of the Federal Rules of Evidence.  They contend that the probative value of such evidence is slight.  Moreover, they maintain that the subtle legal distinction between "total loss" and "salvage vehicle" in New Mexico will confuse jurors, and force the Defendants' attorneys into looking pedantic in their efforts to forestall the jurors from equating the two terms.  Id. at 20-21.

In response, the Plaintiffs argue that they did not know until a month before filing the Motion to Amend that USAA had treated the Sierra as a total loss.  They contend that the special power of attorney to which the Dealerships' point is a form document, and that the Plaintiffs reasonably waited for initial discovery from USAA to confirm whether USAA treated the Sierra as a total loss.  See Plaintiffs' Reply in Support of Motion for Leave to Amend Complaint at 2, filed June 13, 2008 (Doc. 185)("Reply for Motion to Amend").  The Plaintiffs also argue that they did not engage in undue delay on the claims against IADSC.  The Plaintiffs maintain that IADSC is incorrectly equating any delay with undue delay, but that the Plaintiffs delay is reasonable and not prejudicial because their claims are based on the third-party claims the Dealerships brought and which IADSC

has been developing its defense against.  See id. at 3-4.

The Plaintiffs then argue that the Dealerships' arguments on futility of amendment miss the mark.  The Plaintiffs contend that USAA has already admitted it declared the Sierra uneconomical to repair and sold it unrepaired, bringing the Sierra within the definition of salvage vehicle, and that IADSC has further admitted that it did not follow the regulations in removing the Sierra's initial salvage title.  See id. at 5-6.  The Plaintiffs thus maintain that they do not need the total-loss allegations for their salvage-branding claims, but will use the evidence to help prove the extent of the Sierra' damage and rebut any defense that the Dealerships did not notice the condition of the axle.  See id. at 6, 8.

The Plaintiffs also contend that, regardless, the Dealerships have the law wrong.  The Plaintiffs argue that the Dealerships' interpretation ignores the plain language of the statute and the New Mexico Legislature's removal in 2006 of language that expressly stated a one-hundred percent rule.  See id. n.7.  Moreover, the Plaintiffs maintain that, to the extent that the New Mexico regulations conflict with the plain language of the statute, they must fail, and that the Dealerships fail to note that the California cases on which they rely were interpreting a statute involving "total loss salvage vehicles."  Id.

In response to the Dealerships' arguments that rule 403 requires denial of the Motion to Amend, the Plaintiffs argue that rule 403 is not part of a proper rule 15 analysis.  See Reply for Motion to Amend at 9.  The Plaintiffs contend that, even if the Court should incorporate a rule 403 analysis into its rule 15 determination, the evidence is admissible and can be used to rebut a defense that the Sierra had minimal damage, and that the Dealerships' worries about confusion and prejudice are little more than "an expression of the Dealerships' distrust of what the jury will do when the jury is allowed to consider the Dealerships' convoluted and meritless defenses."  Id. at 10.  Finally, the

Plaintiffs maintain that they are not seeking to cure any deficiencies with the Second Amended Complaint, because their earlier Complaints have not failed in any way, that ample time for discovery remains, and that they will suffer prejudice if the Court denies their motion. See id. at 10-11.

> **5.**     **The Motion for Summary Judgment.**

The Dealerships move the Court for summary judgment on what they term "the salvage and title washing claims." Memo. in Support at 1. For the bulk of their argument, they incorporate by reference their arguments regarding why the Plaintiffs' Second Amended Complaint would be futile. They also contest the Plaintiffs' position that the January 2006 legislative revision eliminated the one-hundred percent rule. See Memo. in Support at 8. They contend that the Plaintiffs present a "slanted recitation of the legislative history," and that the revision was aimed at harmonizing the definitions of salvage vehicles and nonrepairable vehicles. Id. They further contend that the Plaintiffs' arguments ignore the New Mexico Administrative Code's interpretations of what constitutes a salvage vehicle, which were modified after the 2006 revisions, but retained the one-hundred percent rule. See Memo. in Support at 9. The Dealerships maintain that there is no genuine issue of material fact whether the Sierra merited a salvage title. See id. at 9-10. They therefore request that the Court grant summary judgment on the first and tenth claims in the Complaint, and on the remaining claims to the extent that they are based on title washing or on non-disclosure of a salvage title. See id. at 9.

The Plaintiffs contend that the plain language of the statute prevents a one-hundred percent rule from being read into the statute. See Plaintiff's Opposition Brief to Dealerships' Motion for Partial Summary Judgment on Salvage and Title Washing Claims at 5, filed July 21, 2008 (Doc. 201)("MSJ Response"). The Plaintiffs assert that their reading of the plain language finds support

in the omission of the phrase "to the extent that the cost of repairing the vehicle for safe operation on the highway exceeds its fair market value" from N.M.S.A. § 66-3-10.1, the statutory section prohibiting the transfer of salvage vehicles without a salvage title. MSJ Response at 8 (emphasis removed). The current version of § 66-3-10.1, the Plaintiffs note, indicates "only that a salvage vehicle must bear a salvage title." MSJ Response at 8. The new definition of salvage vehicle found in § 66-1.4-16C, the Plaintiffs point out, does not contain a one-hundred percent rule. See MSJ Response at 8. The Plaintiffs further argue that the portions of the Administrative Code that the Defendants cite, to the extent they conflict with the statute, cannot change the plain meaning of the statutory language. The Plaintiffs also note that the sections the Dealerships cite are not new regulations, but old sections retained without modification, and the retention may thus have been inadvertent. See MSJ Response at 9-11.

The Plaintiffs further maintain that the argument that the Plaintiffs' interpretation lacks objectivity is incorrect. The Plaintiffs contend that a percentage test is not the only method states have employed for determining which vehicles should be considered salvage and that those states choosing to employ a percentage test have generally done so expressly. See MSJ Response at 11-12. According to the Plaintiffs, more unsafe vehicles are taken off the road "by tethering salvage titles to internal insurance company determinations about the type and extent of damage on a given vehicle," whereas the one-hundred percent rule "allowed tremendous amounts of wiggle room" in the calculations about whether a salvage title was merited. Id. at 13.

In addition to challenging the Dealerships' legal theory, the Plaintiffs also contest the Dealerships' version of the facts. The Plaintiffs maintain that the Sierra's title was washed and that no evidence has been produced in support of the "'clerical error' story" besides the Dealerships' own testimony, which has "inherent credibility problems." Id. at 15. In support, the Plaintiffs quote

from this Court's prior opinion, noting that a "reasonable jury might not find the story about the 'clerical error' to be true." Id. at 16 (quoting Memorandum Opinion and Order at 9, entered July 10, 2008 (Doc. 194)).

The Plaintiffs also contend that the Dealerships' statement of undisputed facts misrepresents a number of facts. The Plaintiffs maintain that USAA's $13,133.00 repair estimate is not an initial estimate, but one created later after the first estimate was lost in a computer crash. See MSJ Response at 16. Moreover, the Plaintiffs argue, this estimate overlooks several damaged items, "most glaringly the axle damage." Id. The Plaintiffs contend that the "clerical error" story is not credible and that, at a minimum, it requires further discovery pursuant to rule 56(f). MSJ Response at 17. The Plaintiffs also dispute the Defendants' calculations of the amount of damage to the Sierra. The Plaintiffs contend that the Defendant's estimate that the axle damage would cost no more than $950.00 to repair is based on an erroneous understanding of the report of the Plaintiffs' expert. See id. at 19. The Plaintiffs maintain that their expert did not provide a separate estimate of the damage based on the unrepaired axle and that a vehicle must be valued as a whole. See id. at 19.

In reply, the Dealerships contend that the Court should give deference to the MVD's administrative interpretation of the statute. They maintain that the relevant language in dispute -- "considers it uneconomical to repair" -- contains two ordinary words, considers and uneconomical, that are undefined in the Motor Vehicle Code, and that the phrase is subject to various conflicting definitions, and that the Court should thus defer to the MVD's construction of those words. Lomas Auto Mall, Inc.'s and M.D. Lohman's Reply to Plaintiffs' Memorandum in Opposition to Motion for Partial Summary Judgment on Salvage and Title Washing Claims at 6, filed August 4, 2008 (Doc. 226)("MSJ Reply")(emphasis removed). They argue that, at a minimum, their reading of the

statute is a reasonable one, and that other courts have concluded that a one-hundred percent rule applies when construing similar language.  See id. at 7.

The Dealerships maintain that as a result of this ambiguity, the Court should defer to the regulations that the Taxation and Revenue Department ("TRD") and the MVD have promulgated. The regulations include a provision that uses the one-hundred percent rule for determining whether a vehicle requires a salvage title.  See id. at 7-9.  They also contend that, while the Plaintiffs have disputed the facts that the Dealerships have presented, they have failed to produce evidence that would create a genuine dispute about any of the facts that the Plaintiffs have purported to challenge. See id. at 9-11.  They argue that the undisputed facts show that the Sierra did not merit a salvage title.  See id. at 11.

### 6. The Hearings.

At the July 8, 2008 hearing, the Court heard argument on the Motion to Amend.  The Court extended the time for discovery two months.  See Transcript of Hearing at 8:11-9:24 (taken July 8, 2008)(Treinen & Court)("July Tr.").[2]  The Court granted the Plaintiffs leave to amend their Complaint, but did not give a definitive ruling on New Mexico's definition of salvage vehicle.  See July Tr. at 50:21-25 (Court).  At the September 10, 2008 hearing on the Motion for Summary Judgment, Charles R. Hughson, counsel for the Dealerships, focused on his argument that "considers it uneconomical to repair" was an ambiguous phrase and that the Dealerships' interpretation was a reasonable one, meaning the Court should defer to the regulations which expressly retained the one-hundred percent rule.  Mr. Hughson gave an example of what he considered would be the absurdity of the Plaintiffs' reading of the statute: that a car could get scratched by a runaway shopping cart

---

[2] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain different page and/or line numbers.

in a parking lot or have its windshield dinged by a rock while driving and the owner could decide it was not worthwhile to repair such insignificant damage, thereby rendering the vehicle a salvage vehicle. See Transcript of Hearing at 9:22-10:12 (taken September 10, 2008)(Hughson)("September Tr."). Mr. Hughson also conceded that, if the Court were to reject his reading of the statute, the Motion for Summary Judgment would be unsuccessful, because the motion turned on that legal point. See id. at 14:17-24 (Court & Hughson). Mr. Treinen then argued in opposition to summary judgment. In addition to the points made in his briefing, Mr. Treinen contended that "uneconomical to repair" is a term of art in the insurance industry and that making such a determination is an objective endeavor. See id. at 21:5-13 (Treinen). Under this standard, Mr. Treinen argued, USAA had an internal policy of declaring a vehicle uneconomical to repair when the salvage value plus the cost of repair exceeded market value -- in other words, when the salvage value of a vehicle was greater than the profit from repairing and selling a vehicle. See id. at 19:5-12, 23:16-24:2.

## STANDARDS GOVERNING LEAVE TO AMEND PLEADINGS

Amendments to a complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "Leave to supplement a complaint shall be liberally granted unless good reason exists for denying leave, such as prejudice to the defendants." Gillihan v. Shillinger, 872 F.2d 935, 941 (10th Cir. 1989). "'[T]he grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court.'" Minter v. Prime Equipment Co., 451 F.3d 1196, 1204 (10th Cir. 2006)(quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971)). A court should "generally refuse leave to amend only on 'a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" Duncan v. Manager, Dep't of Safety, City and County of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-

66 (10th Cir. 1993)).

A showing of undue prejudice can be based on the amendment seeking to introduce new evidence that would be inadmissible at trial because of the risk of unfair prejudice or confusion.  See Duncan v. Manager, Dep't of Safety, City and County of Denver, 397 F.3d at 1315 (holding that district court was justified in denying leave where amendment sought to introduce evidence that court found to be inadmissible at trial under rule 403 of the Federal Rules of Evidence).  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." Gohier v. Enright, 186 F.3d 1216, 1218 (10th Cir. 1999.  "The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim." Id.

A showing of undue delay is made where the proposed amendment comes after the deadline to amend pleadings and the amending party has no adequate explanation for the delay.  See Minter v. Prime Equipment Co., 451 F.3d at 1206.  The Tenth Circuit emphasizes the adjective in "undue delay."  "Lateness does not of itself justify the denial of the amendment. . . . At some point, however, delay will become undue, placing an unwarranted burden on the court, or will be become prejudicial, placing an unfair burden on the opposing party." Id. at 1205 (internal quotation marks omitted).  See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998)(noting motion to amend filed "five months after discovery cut off").  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'" Id. at 1206 (quoting Viernow v. Euripedes Development Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)).  Undue delay may also occur where a plaintiff was aware of all the information on which the proposed amendment is based before the filing of an earlier complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

## NEW MEXICO LAW REGARDING SALVAGE TITLES

The New Mexico laws concerning salvage vehicles have their origin in two places: (i) in New Mexico's Motor Vehicle Code, Title 66, Article I of the New Mexico Statutes; and (ii) in Title 18, Chapter 9 of the New Mexico Administrative Code.  The New Mexico Legislature charged the TRD, which includes the MVD, with enforcing New Mexico's Motor Vehicle Code.  See N.M.S.A. § 66-2-3(A).  The authority that the New Mexico Legislature granted to the TRD includes the power to issue regulations to implement statutes that the TRD is charged with enforcing, see id. § 9-11-6.2(A), including regulations "interpreting and exemplifying" the relevant statutes, id. § 9-11-6.2(B)(1).

### 1.      Statutory Provisions.

The New Mexico Legislature recently amended the salvage statutes.  Under the old laws, the New Mexico Statutes did not have an express definition of a salvage vehicle, but rather required salvage titles for vehicles meeting certain conditions:

> Unless the certificate of title conveying ownership indicates the vehicle as "salvage", it shall be unlawful for any person to sell or otherwise convey ownership of any vehicle that has been damaged by collision or other occurrence to the extent that the cost of repairing the vehicle for safe operation on the highway exceeds its fair market value or that has been declared a total loss by an insurance company. This section shall not apply to any person who sells or otherwise conveys ownership if the damage did not occur when that person was the registered owner of the vehicle, the certificate of title did not indicate "salvage" when it was transferred to that person and that person has no knowledge that the cost of repair exceeded the fair market value or that the vehicle had been declared a total loss.

N.M.S.A. 1978 § 66-3-10.1 (1990)(emphasis added).[3]

On January 1, 2006, the amended laws came into effect, and the statutory definition of

---

[3] While the old statute did not use the words one-hundred percent, the parties do not dispute that the old statute created what the parties and the Court refer to as a one-hundred percent rule.

"salvage vehicle" now is:

> C. "salvage vehicle" means a vehicle:
>
> (1) other than a nonrepairable vehicle, of a type subject to registration that has been wrecked, destroyed or damaged excluding, pursuant to rules issued by the department, hail damage, to the extent that the owner, leasing company, financial institution or the insurance company that insured or is responsible for repair of the vehicle considers it uneconomical to repair the vehicle and that is subsequently not repaired by or for the person who owned the vehicle at the time of the event resulting in damage; or
>
> (2) that was determined to be uneconomical to repair and for which a total loss payment is made by an insurer, whether or not the vehicle is subsequently repaired if, prior to or upon making payment to the claimant, the insurer obtained the agreement of the claimant that, pursuant to rules of the department, the title must be branded and submitted to the department for issuance of a salvage certificate of title for the vehicle;

N.M.S.A. 1978 § 66-1-4.16.  There are no New Mexico cases or federal cases interpreting these

definitions.

### 2.   <u>**Administrative Regulations.**</u>

The regulations in the Administrative Code do not elaborate on the definition of salvage title,

but simply adopt the statutory definition:

> A.  "salvage-branded title" or "salvage title" means a title issued by the motor vehicle division which title indicates the subject vehicle is a salvage vehicle; and
>
> B.  "salvage vehicle" means a vehicle that meets the definition of a salvage vehicle as defined in Subsection C of Section 66-1-4.16 NMSA 1978 of the Motor Vehicle Code.

N.M.A.C. 18.19.3.50.  While not specifically construing the statutory definitions, the regulations

do go on to describe various scenarios requiring a salvage title:

> 18.19.3.52 **SALVAGE-BRANDED TITLES – SALVAGE VEHICLES:**
>
> A.  A salvage-branded title must be issued to transfer title to a salvage vehicle.
>
> B.   In determining whether a vehicle is a salvage vehicle, only costs related to

-18-

returning the vehicle to a road-worthy condition shall be included as costs of repairing the vehicle.  Costs which are beyond those necessary to make a damaged vehicle safely operable on the highways, such as replacing a clear windshield with a tinted one or adding racing stripes, shall be excluded.  Payments not related to the repair of the vehicle, such as compensation for medical costs, car rentals, lost work time and the like, shall also be excluded.  Fair market value shall be that indicated for the make and model in the national automobile dealers association used car pricing guide, or equivalent publication, exclusive of the fair market value of accessories, such as a stereo system.

C.  Example: The interior of a vehicle is vandalized.  A stereo system is ripped out and destroyed; the interior is set on fire.  The market value of the vehicle, exclusive of the stereo, is $1,000 prior to the incident.  The stereo was worth $1,500.  Costs of restoring the interior to allow safe operation on the highways is $800.  This vehicle is not a salvage vehicle.  The costs of repairing the vehicle so that it is safe to operate is $800, which is less than the $1,000 fair market value of the vehicle itself, exclusive of the stereo.

D.  The declaration by an insurance company that a vehicle is a salvage or non-repairable vehicle makes the vehicle a salvage vehicle or non-repairable vehicle regardless of the relative amounts of repair costs versus fair market value.

E.  Example: If, in the proceeding example, an insurance company settled claims with respect to the vehicle for $2,200 and declared the vehicle a salvage or non-repairable vehicle, the vehicle is a salvage vehicle or non-repairable vehicle, depending on the determination of the insurance company, so long as that determination is not inconsistent with statutory definitions.

N.M.A.C. 18.19.3.52.  Both §§ 18.19.3.50 and 18.19.3.52 of the Administrative Code were revised

in the wake of the 2006 amendments.

There is a further section of the Administrative Code that specifies what an insurance

company should do when it takes title to a salvage or nonrepairable vehicle upon paying a total-loss

settlement:

### 18.19.3.53 **SALVAGE-BRANDED TITLES – BRANDING OF TITLE:**

A.  The procedures specified in 18.19.3.53 NMAC govern the transfer of title to a salvage or non-repairable vehicle.

B.  Transfer to an insurance company: The steps below are to be followed when an insurance company takes title to a salvage vehicle or non-repairable vehicle in

exchange for a payment to a person making a claim for vehicle damages.

(1)  The insurance company or its authorized agent shall obtain the title or manufacturer's certificate of origin (MCO) for the vehicle and verify that the document is in the name of the former owner.

(2)  The former owner or the former owner's authorized agent shall sign the title or MCO on the seller's release line.  If a business was the former owner, the name of the business must appear with the signature of the business's owner, officer or agent.

(3)  The name of the insurance company shall be entered in the purchaser section of the title or MCO.

(4)  The insurance company shall apply for a salvage title or non-repairable certificate in its name before transferring title to the vehicle.

(5)  The insurance company shall submit the endorsed title or MCO to the motor vehicle division, together with a written explanation of the reason for the branding.  In the case of a salvage vehicle, a statement must be included of the costs of repair to make the vehicle safe for operation on the highways and the estimate of its fair market value immediately prior to damage.  If the title was issued by a jurisdiction other than New Mexico, a copy of the title must be sent to the issuing jurisdiction with a completed "statement of loss."

N.M.A.C. 18.19.3.53.

## SALVAGE TITLE LAWS FROM OTHER STATES

New Mexico, of course, is not the only state that has enacted laws dealing with salvage vehicles and salvage titles.  All fifty states have such laws, although there is no uniform law of salvage.  The Dealerships contend that California law is the closest to New Mexico law, but a number of other states also have laws that use a percentage test for determining whether a vehicle should be considered salvage.

**1.**     **California Law on Salvage Vehicles.**

California Vehicle Code § 544 defines "total loss salvage vehicle" using language nearly identical to that in N.M.S.A. § 66-1-4.16C.  Section 544 provides:

"Total loss salvage vehicle" means either of the following:

(a) A vehicle, other than a nonrepairable vehicle, of a type subject to registration that has been wrecked, destroyed, or damaged, to the extent that the owner, leasing company, financial institution, or the insurance company that insured or is responsible for repair of the vehicle, considers it uneconomical to repair the vehicle and because of this, the vehicle is not repaired by or for the person who owned the vehicle at the time of the event resulting in damage.

(b) A vehicle that was determined to be uneconomical to repair, for which a total loss payment has been made by an insurer, whether or not the vehicle is subsequently repaired, if prior to or upon making the payment to the claimant, the insurer obtains the agreement of the claimant to the amount of the total loss settlement, and informs the client that, pursuant to subdivision (a) or (b) of Section 11515, the total loss settlement must be reported to the Department of Motor Vehicles, which will issue a salvage certificate for the vehicle.

West's Ann.Cal.Vehicle Code § 544.

California, unlike New Mexico, does not have any administrative regulations dealing with the statutory definition. There is, however, case law in California construing the provision. In Martinez v. Enterprise Rent-A-Car Co., 13 Cal. Rptr. 3d 857 (Ct. App. 2004), a California Court of Appeal upheld a lower court's grant of summary judgment in favor of Enterprise Rent-A-Car Co. where Enterprise sold a damaged vehicle to a car dealer without applying for a salvage title. The vehicle was subsequently sold on a clean title to a consumer who claimed he was defrauded into buying a salvage vehicle. Enterprise had a company policy that it would auction off vehicles in unrepaired condition on clean titles where the repair estimate were forty percent to seventy-nine percent of the car's pre-accident wholesale value, while cars whose estimated repairs exceeded eighty percent of the wholesale value would be declared salvage and auctioned on salvage titles. The car at issue in Martinez v. Enterprise Rent-A-Car Co. fell within the forty percent to seventy-nine percent category. See 13 Cal. Rptr. 3d at 859.

The plaintiff in Martinez v. Enterprise Rent-A-Car Co. argued that the phrase "considers its

uneconomical to repair" in § 544 was a subjective standard and that, because Enterprise determined, based on its own internal rules, that it was uneconomical to repair the vehicle, the vehicle was salvage.  The California Court of Appeal rejected the argument, finding the "Legislature's use of the term 'total loss salvage vehicle' as opposed to simply 'salvage vehicle'. . . significant." Martinez v. Enterprise Rent-A-Car Co., 13 Cal. Rptr. 3d at 861.  "'Total loss'," the California Court of Appeal noted, "is commonly used to mean a 'complete destruction' of the property at issue." Id. (quoting Black's Law Dict. (7th ed. 1999)).

The California Court of Appeal in Martinez v. Enterprise Rent-A-Car Co. went on to state that the normal meaning of "'uneconomical' is 'costly, wasteful," which was in line with the definition of total loss." Id. (quoting Webster's 3d New Internat. Dict. at 2493 (1986)).  The California Court of Appeal concluded: "Logically, a vehicle is 'uneconomical to repair' when the cost of repairs exceeds the vehicle's undamaged fair market value."  13 Cal. Rptr. 3d at 861. Because Enterprise's eighty-percent rule for declaring salvage was more conservative than the one-hundred percent rule the California Court of Appeal discerned in the statute, the California Court of Appeal held that Enterprise's use of its own internal valuation could not be the basis for an unfair business practices or fraud claim.  See id. at 864.

### 2.     Other Percentage Rule States.

A number of other states use a percentage rule to determine when a damaged vehicle should have a salvage title or similar designation.  Alabama specifies that a total loss occurs when an insurance company settles a claim where "a vehicle is damaged and the damage to the vehicle is greater than or equal to 75 percent of the fair retail value of the vehicle prior to damage . . . ."  Ala. Code § 32-8-87(d). Arkansas defines a salvage vehicle as having sustained water damage or "any other damage in an amount equal to or exceeding seventy percent (70%) of its average retail value

. . . ." Ark. Code Ann. § 27-14-2301(6)(B).  In Colorado, salvage vehicle "means a vehicle that is damaged by collision, fire, flood, accident, trespass, or other occurrence, excluding hail damage, to the extent that the cost of repairing the vehicle to a roadworthy condition and for legal operation on the highways exceeds the vehicle's retail fair market value immediately prior to such damage . . . ." Colo. Rev. Stat. § 42-6-102(17)(a).

> In Kentucky, a salvage vehicle is
>
> A vehicle which has been wrecked, destroyed, or damaged, to the extent that the total estimated or actual cost of parts and labor to rebuild or reconstruct the vehicle to its preaccident condition and for legal operation on the roads or highways exceeds seventy-five percent (75%) of the retail value of the vehicle, as set forth in a current edition of the National Automobile Dealer's Association price guide.

Ky. Rev. Stat. Ann. § 186A.520(1)(a).  Louisiana requires a salvage title to transfer a vehicle that is a "total loss" vehicle, La. Rev. Stat. Ann. § 32:702(11), which is defined as a "motor vehicle which has sustained damages equivalent to seventy-five percent or more of the market value as determined by the most current National Automobile Dealers Association Handbook," id. § 32:702(12).

Michigan has a graduated scheme, where insurance companies must, "if the estimated cost of repair, including parts and labor, is equal to or more than 75% but less than 91% of the predamaged actual cash value of the vehicle, apply for a salvage certificate of title," but "if the estimated cost of repair, including parts and labor, is equal to or greater than 91% of the predamaged actual cash value of the vehicle, apply for a scrap certificate of title."  Mich. Comp. Law § 57.217c(2)(a)(ii).  Nevada law includes several categories of distressed vehicles within the definition of salvage vehicle, including total loss vehicles, see Nev. Rev. Stat. § 487.770, which are vehicles that have "been wrecked, destroyed or otherwise damaged to such an extent that the cost of repair, not including any cost associated with painting any portion of the vehicle, is 65 percent or more of

the fair market value of the vehicle immediately before it was wrecked, destroyed or otherwise damaged," id. § 487.790(1)(b).

In Oklahoma, the test is whether "the cost of repairing the vehicle for safe operation on the highway exceeds sixty percent (60%) of the fair market value of the vehicle." Okla. Stat. title 47, § 1111(C)(1).  Texas labels a vehicle a "salvage motor vehicle" if it

> has damage to or is missing a major component part to the extent that the cost of repairs, including parts and labor other than the cost of materials and labor for repainting the motor vehicle and excluding sales tax on the total cost of repairs, exceeds the actual cash value of the motor vehicle immediately before the damage.

Tex. Transp. § 501.091(15)(A)(i).  West Virginia requires salvage titles for "a motor vehicle which has sustained damages equivalent to seventy-five percent or more of the market value as determined by a nationally accepted used car value guide . . . ."  W. Va. Code § 17A-4-10(a).

## ANALYSIS

There are two motions before the Court in this opinion: (i) the Motion to Amend; and (ii) the Motion for Summary Judgment.  In the first motion, the Plaintiffs request that the Court grant them leave to file a Second Amended Complaint.  The Court has already orally granted leave to amend, but further explains the reasons for its decisions below.  The Second Amended Complaint raises two new discrete sets of allegations: (i) allegations against IADSC, a current party to the case as a Third-Party Defendant, that the Plaintiffs seek to make a Defendant as well; and (ii) additional allegations involving USAA's treatment of the Sierra claim as a total loss.  The Court concludes that both groups of amendments are appropriate and that none of the reasons which the Tenth Circuit has announced for denying leave to amend -- despite the liberal standards of rule 15 -- are applicable here.

One of the grounds for denying the Motion to Amend that the Dealerships raise leads to the

basis of the Motion for Summary Judgment.  The Dealerships argue that New Mexico law on salvage title embodies a one-hundred percent rule that the Plaintiffs' pleadings do not satisfy.  The Court orally granted the Motion to Amend at the July 8, 2008 hearing without giving a definitive ruling on the particulars of New Mexico's salvage law.  The Motion for Summary Judgment, however, requires the Court to confront that issue.  The one-hundred percent rule the Dealerships advocate, based on the New Mexico Administrative Code, is at odds with the plain language of the New Mexico statute and the New Mexico Legislature's decision to remove the language that would support the Dealerships' interpretation when revising the Motor Vehicle Code in 2006.  All the other arguments the Dealerships marshal are either unpersuasive or involve statutory language that is distinguishable from the language found in the New Mexico statutes.  Accordingly, the Court concludes that New Mexico salvage law should not be interpreted as espousing a one-hundred percent rule.  Instead, New Mexico law focuses on individualized assessments whether a vehicle is uneconomical to repair and, to the extent the MVD's regulations conflict with the statutory definition, the Court will not apply the regulations' definitions of salvage vehicle.

**I.      THE COURT WILL ALLOW THE PLAINTIFFS TO FILE THEIR SECOND AMENDED COMPLAINT.**

The Plaintiffs seek to amend their Complaint for two specific purposes: (i) to add allegations against USAA; and (ii) to add IADSC as a Defendant.  The general rule is that amendments to a complaint "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  IADSC and the Dealerships raise several arguments that the Plaintiffs should not be allowed to amend their Complaint a second time.  These arguments, however, are ultimately unavailing.

**A.      THE PLAINTIFFS MAY AMEND THEIR COMPLAINT TO NAME IADSC AS A DEFENDANT.**

As the Court reads IADSC's arguments, it is raising three grounds for denying the Plaintiffs'

request: (i) that the Plaintiffs have unduly delayed requesting leave to amend; (ii) that the Plaintiffs have acted in bad faith; and (iii) that the civil-conspiracy claim the Plaintiffs want to bring against IADSC is an effort to cure deficiencies that could have been resolved in the First Amended Complaint.  The argument that the Plaintiffs engaged in undue delay and the argument that they acted in bad faith overlap to a degree, and the Court will discuss these two  arguments together.  All three arguments that IADSC advances, however, are ultimately unsuccessful.  Given the Plaintiffs' explanation for their delay and the progress of the case, the Court does not believe that the Plaintiffs either unduly delayed or acted in bad faith.  Nor are the Plaintiffs seeking to correct a deficiency; rather, they are attempting to bring new claims.

### 1.    The Plaintiffs Did Not Unduly Delay Before Seeking to Add Claims Against IADSC.

IADSC's main argument is that the Plaintiffs were aware of their claims against IADSC for several months before they sought to leave to amend.  IADSC contends that the Plaintiffs should have known about their potential claims at least since the filing of the Third-Party Complaint and that the Plaintiffs have let most of the discovery period pass without taking action, seeking to bring claims against IADSC recently.  IADSC urges the Court to find that these actions -- or inactions -- constitute undue delay and bad faith.  The Plaintiffs do not dispute IADSC's basic contention that the Plaintiffs have been aware, at least to some degree, of their potential claims before seeking leave to amend.  Instead, they argue that their delay has not been undue because IADSC has had time to develop its defenses and engage in relevant discovery, and because the claims they seek to bring are based on the same conduct underlying the claims that the Dealerships raised when bringing IADSC in as a Third-Party Defendant.  The Court believes that the Plaintiffs are correct.

Rule 15(a) is a liberal standard, and the cases where undue delay has been found are different

from this scenario.  "Lateness does not of itself justify the denial of the amendment. . . . At some point, however, delay will become undue, placing an unwarranted burden on the court, or will be become prejudicial, placing an unfair burden on the opposing party."  Minter v. Prime Equipment Co., 451 F.3d at 1205 (internal quotation marks omitted).  Often, the basis for a finding of undue delay is that a party seeks to add new pleadings after discovery has closed.  See, e.g., McKnight v. Kimberly Clark Corp., 149 F.3d at 1130 (noting motion to amend filed "five months after discovery cut off").  Here, particularly given the Court's extension of the discovery period, there is ample remaining time for IADSC to undertake any new discovery necessary.  Moreover, given that the Plaintiffs' claims rest on a similar factual foundation to the Dealerships' claims, IADSC likely already has a significant amount of the discovery it needs and has developed a good sense of how it will defend itself.  While IADSC has represented that it will have to undertake more discovery if amendment is allowed, particularly on the civil conspiracy claim, the Court does not believe that the additional discovery will be unduly burdensome or that IADSC will be unable to obtain the new discovery needed before discovery closes.  If IADSC is unable to complete the new discovery by the time discovery closes, it can re-approach the Court for an extension or for additional discovery.

Furthermore, the Plaintiffs have articulated a reasonable basis for not bringing their claims earlier.  At the July 8, 2008 hearing, Mr. Treinen stated that the Plaintiffs were being conservative and wanted to see if the discovery was showing any basis for the third-party claims were being brought against IADSC.  See July Tr. at 11:25-12:3 (Treinen & Court).  This approach strikes the Court as reasonable, particularly as the Plaintiffs are not bringing completely new allegations out of nowhere, but rather are effectively building on some of the same factual circumstances that have been at issue with the Dealerships' claims.  Between the amount of discovery remaining in this case and the Plaintiffs' reasonable basis for delay, the Court cannot say that the Plaintiffs have engaged

in an undue delay that would be grounds for denying leave to amend.  For the same reasons, the

Court also does not see any basis for believing that the Plaintiffs' actions are in bad faith.

> ## 2.   The Plaintiffs Are Not Attempting to Cure Deficiencies in Their Pleadings.

IADSC urges the Court to deny leave to amend because the Plaintiffs have failed "to cure

deficiencies by amendments previously allowed . . . ."  Duncan v. Manager, Dep't of Safety, City

and County of Denver, 397 F.3d at 1315 (internal quotation marks omitted).  IADSC argues that the

Plaintiffs' request to add a civil conspiracy claim against it amounts to an attempt to cure

deficiencies not cured in the First Amended Complaint.  IADSC contends that the Plaintiffs could

have inserted this claim in their first revision of the Complaint and their current attempt to do so

amounts to trying to rectify this earlier neglect.

As the Plaintiffs point out, however, the previous Complaints did not raise civil conspiracy

claims against IADSC.  The Plaintiffs are not seeking to cure a deficiency that has been identified

in a previously pled cause of action, but to add a new claim.  A denial of a motion to amend on

grounds of failure to cure deficiencies is generally used where a claim has been dismissed under rule

12(b)(6) and the plaintiff is seeking to correct the defective pleadings, or in similar circumstances.

See, e.g., TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022,

1098 (10th Cir. 1992)(upholding denial of leave to amend where dismissal granted and proposed

amendment would not cure deficiencies).  It is thus closely related to some of the other scenarios

in which courts deny leave to amend: when a party tries to use amendment to circumvent a pending

motion to dismiss or to modify its pleadings to make them a moving target that is difficult for an

opponent to pin down.  See Minter v. Prime Equipment Co., 451 F.3d at 1206.  The Plaintiffs are

not engaging in such tactics here.  The Plaintiffs are adding a new claim, not seeking to recast old

claims to avoid dismissal or otherwise disingenuously trying to rescue a failing case. IADSC's argument that the Plaintiffs are attempting to cure deficiencies is better understood as an argument that the Plaintiffs are unduly delaying raising their claims, which the Court has already found is not a persuasive argument on the facts of the case. Accordingly, the Court will allow the Plaintiffs to amend their Complaint to add claims against IADSC and make IADSC a Defendant in this action.

**B.    THE PLAINTIFFS MAY AMEND THEIR COMPLAINT TO ADD NEW ALLEGATIONS AGAINST USAA.**

Unlike IADSC, USAA is already a direct Defendant in this action. The Plaintiffs are seeking leave to add new allegations against USAA regarding USAA's treatment of Buckner's insurance claim on the Sierra as a total-loss claim. Although USAA has not directly responded in opposition to the Motion to Amend, the Dealerships oppose amendment and have raised several arguments why the Court should not allow the Plaintiffs to supplement their allegations against USAA: (i) that the Plaintiffs have unduly delayed amendment, because they were aware of their claims well before seeking amendment; (ii) that amendment would be futile, because the allegations do not satisfy the one-hundred percent rule for salvage vehicles; and (iii) that evidence of USAA treating the Sierra claim as a total loss would be inadmissible under rule 403 of the Federal Rules of Evidence, because it is of little probative value, and would cause significant confusion to jurors and would unfairly prejudice the Defendants. The Court is not persuaded that these arguments counsel denial of the motion to add new allegations against USAA.

**1.    The Plaintiffs Did Not Unduly Delay Before Seeking to Add New Allegations Against USAA.**

When a plaintiff gained relevant information is an important factor in determining whether the plaintiff has unduly delayed amendment. See Pallottino v. City of Rio Rancho, 31 F.3d at 1027 (noting motion to amend filed "was not based on new evidence unavailable at the time of the

original filing"). The Dealerships argue that the Plaintiffs should have known about USAA's treatment of the Sierra as a total loss before this lawsuit began, while the Plaintiffs contend that they did not have sufficient information to plead their new theory until receiving initial disclosures from USAA. The Court believes that the Plaintiffs' caution is reasonable. The documents that the Dealerships highlight to show that the Plaintiffs knew or should have known earlier about the total-loss settlement only hint at a total loss. When the Plaintiffs received confirmation through USAA's initial disclosures, they moved the Court to amend their pleadings within a month.

The Dealerships' knowledge argument hinges on the special power of attorney. The special power of attorney grants CoPart authority for title transfers involving total-loss vehicles. See POA (granting "authority and power of attorney in connection with the disposition of the total-loss vehicles assigned to Copart by USAA"). The Dealerships are correct that the language in the power of attorney gives some indication that the Sierra settlement involved a total-loss claim. The Plaintiffs are also correct, however, that the power of attorney is apparently a routine form document. The power of attorney states that it is a "National POA for all 50 States," and a "National POA for all Counties in all 50 States." Id. The remaining MVD documents may be indicative that a title transfer occurred, but they bear no further indication that USAA treated the Sierra claim as a total loss. Given this limited indication of a total loss, the Court believes that the Plaintiffs were justified in waiting to receive more solid information.

The Dealerships also note that USAA told Mr. Treinen that USAA had not declared the Sierra salvage because the damage to the Sierra was less than fifty-percent of the value. The Dealerships assert that this conversation should have put Mr. Treinen "on notice that whether the Sierra merited a salvage title due to a salvage vehicle declaration was a critical question." Dealerships' Response at 18. The Dealerships are probably correct in their assessment, but the

Court does not see how that would lead to the conclusion that the Plaintiffs have unduly delayed. Mr. Treinen apparently explored this "critical question" in his initial discovery requests and waited until receiving initial disclosures before filing for leave to amend.

Finally, the Dealerships briefly mention that the Plaintiffs' initial Complaint alleged that USAA declared the Sierra a total loss. Paragraph 18 of the first Complaint reads: "Upon information and belief, MVD issued a salvage title for the Sierra because the Sierra had been declared a total loss by the insurance company as a result of flood damage." Complaint ¶ 18, at 3. As the Plaintiffs note, this is based upon an MVD document indicating that flood damage had caused the Sierra to be totaled. Further discovery has not borne out that initial indication. See Reply for Motion to Amend at 2 n.1. In light of these events, the Court does not see any problem with the Plaintiffs now seeking to allege a different total-loss theory.

In sum, the Plaintiffs did not have a solid foundation for their new allegations until receiving initial disclosures stating that USAA had treated the Sierra claim as a total loss. The delay between the Plaintiffs receiving the disclosures and their current motion was only a month. Given the progress of the case, the Plaintiffs' actions do not amount to undue delay. Compare McKnight v. Kimberly Clark Corp., 149 F.3d at 1130 (noting motion to amend filed "five months after discovery cut off"); First City Bank NA v. Air Capitol Aircraft Sales, Inc., 820 F.2d 1127, 1133 (10th Cir. 1987)(noting motion to amend filed after final pretrial conference held).

### 2.     The Plaintiffs' Proposed Allegations Against USAA Are Not Futile.

The Dealerships argue that the proposed allegations against USAA are futile because they do not allege that the cost of repairing the Sierra exceeded its market value, but only that USAA treated the Sierra claim as a total loss. The Plaintiffs' argument that the total-loss allegations are important, independent of any legal effect, because the allegations go to showing damage to the

Sierra and rebutting any defense that the damage was minimal, has merit.  Moreover, the one-hundred percent rule is an incorrect reading of the New Mexico statute on salvage vehicles.  The Court will discuss this latter point in detail in Part II of the Analysis.

### 3.   The Evidence Underlying Plaintiff's Proposed Allegations Against USAA is Not Inadmissible Under Rule 403 of the Federal Rules of Evidence.

USAA argues that amendment should not be allowed because evidence that USAA processed Buckner's Sierra claim as a total loss is inadmissible under rule 403 of the Federal Rules of Evidence.  Exclusion of evidence is appropriate under rule 403 where its "probative value is substantially outweighed by the danger of unfair prejudice, [or] confusion of the issues . . . ."  Fed. R. Evid. 403.  The Plaintiffs argue that rule 403 is not an appropriate argument at this stage.  The Dealerships contend that such issues are proper in the context of amending pleadings, relying on Duncan v. Manager, Dept. of Safety, City and County of Denver, which upheld a district court's denial of a motion to amend or supplement a complaint on grounds that plaintiff presented no "authority suggesting that Rule 15 requires the court to accept a supplemental complaint based on evidence that would not be admissible in court."  397 F.3d at 1315.  In Duncan v. Manager, Dept. of Safety, City and County of Denver, the district court had "construed the supplemental complaint as an attempt to introduce new evidence," id., a somewhat unusual formulation that makes it unclear whether the case applies to all motions to amend.  Regardless, however, even if the challenge is appropriate, the Court agrees with the Plaintiffs that the Dealerships have not met the stringent burden of showing inadmissibility under rule 403.

First, evidence that USAA treated the Sierra claim as a total loss is not, as the Dealerships suggest, of negligible probative value.  For example, as the Dealerships acknowledge, the evidence would be probative whether the Sierra had axle damage.  Contrary to the Dealerships' assertions that

such evidence does not make the damage "any more probable than USAA's repair estimate," Dealerships' Response at 20, such evidence could undercut the value jurors place on USAA's estimate. Moreover, the Dealerships' arguments regarding the minimal probative weight of the evidence assumes that USAA's estimate is somehow effectively conclusive evidence of the Sierra's condition. Additionally, the evidence would be important to the Plaintiffs' alternative theory that the Sierra should have been branded salvage, which requires a showing that the insurer made a total loss payment. See N.M.S.A. 1978 § 66-1.4-16(C)(2).

Second, the confusion or unfair prejudice that the evidence may engender is insufficient to justify exclusion. The Dealerships argue that the finer points of the distinction between total loss and salvage will be lost on jurors, who will come to view the two terms interchangeably, forcing the Dealerships' counsel into the "unenviable and prejudicial role of having to teach the jurors how to use the English language." Dealerships' Response at 21. The Court has more faith in the competence and dedication of the average juror and believes that jurors will be able to keep the two separate. Moreover, a determination of total loss is a statutory requirement under the second prong of the salvage definition. The Dealerships also argue that, in making sure that jurors do not equate the two terms, their counsel will appear "pedantic" and come off looking like lawyers who are "splitting hairs to get out of trouble." Id. Making such arguments may give some jurors the sense that the Dealerships are attempting to weasel out of liability, but the Court does not believe that the prejudice rises to the level of being so severe or inflammatory that the unfair prejudice substantially outweighs the evidence's probative value.

## II.    NEW MEXICO LAW DOES NOT MANDATE A ONE-HUNDRED PERCENT RULE FOR SALVAGE TITLES.

One of the central disputes in this case is the proper reading of New Mexico's laws and

regulations regarding salvage titles.  The Defendants have adopted the position that the statute is ambiguous, requiring the Court to look to the regulations for an authoritative interpretation.  The Plaintiffs take the opposite approach, asserting that the statute is clear and that its plain language forbids the categorical one-hundred percent rule found in the regulations.  No decisions from the New Mexico state courts are available to shed light on the correct reading of the disputed statutory provision.  Because there is no New Mexico case law on the subject, the Court must predict how New Mexico's highest court would rule if presented with the same issue.  See Wade v. Emcasco Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007).   The Court believes that the Supreme Court of New Mexico, if called upon to decide the issue, would rule in favor of the Plaintiffs' interpretation.

At the outset, the Court must determine the appropriate level of review.  The Defendants advocate deference to the agency's interpretation of the statute, as expressed in the regulations.  The Plaintiffs contend that the statute is clear and that any conflicting regulation must give way to the statute.  The parties do not seem to differ much about the threshold standard to apply, but rather are at odds whether the statute is ambiguous, thus bringing the regulations into play.  New Mexico courts have frequently referenced the familiar Chevron analysis of an agency's interpretation of a statute.  See, e.g., Dona Ana Mut. Domestic Water Consumers Ass'n v. New Mexico Public Regulation Comm'n, 140 N.M. 6, 10, 139 P.3d 166, 170 (2006))(citing  Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)); Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n ¶ 19, 130 N.M. 497, 501, 27 P.3d 984, 988 (Ct. App. 2001)(same).  New Mexico has not, however, tethered its approach to administrative law to the federal standard. Instead, New Mexico has acknowledged that Chevron review is similar to the New Mexico test.  See Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n ¶ 19, 130 N.M. at 501, 27 P.3d at 988 ("We note, without specifically addressing, a similar view of deference to agency

-34-

interpretation expressed by the United States Supreme Court.").  Ultimately, though, in the present case, there seems to be no relevant differences between the federal and state standards.

As the Defendants point out, New Mexico has long "recognized the power of agencies to interpret and construe the statutes that are placed, by legislative mandate, within their province." Dona Ana Mut. Domestic Water Consumers Ass'n v. New Mexico Public Regulation Comm'n, 140 N.M. at 10, 139 P.3d at 170.  "This deference is not absolute, however, and [courts] will reject an agency's interpretation even of an ambiguous statute if it appears unreasonable or inconsistent with legislative intent."  Id.  As the Supreme Court of New Mexico stated: "[I]t is the function of the courts to interpret the law, and we are therefore not bound by [an] agency's interpretation (of law) and may substitute (our) own judgment for that of the agency."  Id. at 9, 139 P.3d at 169 (brackets in case, internal quotation marks omitted).

New Mexico case law indicates that, as in Chevron, the primary issue is whether the statute being scrutinized is unclear or ambiguous.  "When a statute is unclear, an agency's interpretation of the statute through rule making is entitled to be given 'substantial weight' by the courts."  Old Abe Co. v. New Mexico Mining Comm'n ¶ 19, 121 N.M. 83, 90-91, 908 P.2d 776, 783-84 (Ct. App. 1995).  Conversely, a regulation is invalid if it contradicts a "clear and unambiguous" statute.  State ex rel. Helman v. Gallegos, 117 N.M. 346, 356-67, 871 P.2d 1352, 1362-63 (1994).  There is some indication that this is not a bright-line rule.  The Supreme Court of New Mexico has noted that it is "more likely to defer to an agency interpretation" in three situations: (i) where the statute is ambiguous; (ii) where "the legal questions presented implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function;" and (iii) where "it appears that the agency has been delegated policy-making authority in the area."  Dona Ana Mut. Domestic Water Consumers Ass'n v. New Mexico Public Regulation Comm'n ¶ 10, 140

N.M. at 9-10, 139 P.3d at 169-70.  The Supreme Court of New Mexico listed these three areas in the conjunctive, so it is not clear whether all three prongs must be met before affording deference to an agency.  It also appears that, in New Mexico, even if all these factors are present, a court may nonetheless decline to give deference to an agency.  See id. (noting courts "more likely to defer" when factors present)(emphasis added).

The Court need not wade into those troubled waters, however, because the dominant thread running through all the New Mexico cases discussing deference to agency interpretations is whether the statute is clear.  The Court is not aware of any case where a New Mexico court has upheld a regulation that contravenes a clear statute.  Moreover, even a regulation construing an unambiguous statute are not valid if it "appears unreasonable or inconsistent with legislative intent."  Id., 140 N.M. at 10, 139 P.3d at 170.  Given the plain language of the statute, and given the Legislature's 2006 amendments to the Motor Vehicle Code, discerning a one-hundred percent rule from the new language is unreasonable and not in accord with legislative intent.

First, the Court does not view the statutory definition of salvage vehicle as ambiguous.  The key phrase, "considers it uneconomical to repair," is not mysterious or unsuitable to judicial construction.  While the word "considers" has several definitions, it has only one definition that makes sense in the context of the statute: "judge or classify."  Merriam-Webster Online Dict. "Uneconomical" means "not economically practicable."  Id.  The phrase "uneconomical to repair," given its plain meaning, involves a determination that it is not economically worthwhile to make a repair.  This meaning is not unclear and follows directly from the words of the statute.  Even the Dealerships' original briefing on salvage law, in opposition to the Motion to Amend, reveals some recognition of this point.  In that briefing, the Dealerships argue that, "[r]ead alone, NMSA 1978 §66-1-4.16(C)(1) . . . would sanction a process whereby salvage hinges on whether 'someone

considers it uneconomical to repair' the vehicle." Dealerships' Response at 8. The Dealerships' main thrust in that original briefing is that the phrase creates a "hopelessly subjective" standard, and not that the phrase is unclear.  Id.

The Dealerships' later arguments that the statute is ambiguous are ultimately unconvincing. They contend that the use of the one-hundred percent rule is consistent with the phrase "uneconomical to repair." The Dealerships are not wrong to make such an assertion. For most people, when the cost to repair an item exceeds its value, they would consider repair to be uneconomical. The one-hundred percent rule does not, however, encapsulate the broader universe of situations that could also be uneconomical to repair. The Dealerships' argument seizes on one subset of situations that fall under the label "uneconomical to repair" and then attempts to make the subset equal the whole. An illustration makes this point. If a directive used the phrase "You are allowed to drink beverages in the office," "you are allowed to drink coffee in the office" would be consistent with the first phrase. The first phrase, however, encompasses a broader array of conduct and it would be unreasonable to equate the first and the second phrase. The relationship between the one-hundred percent rule and the phrase "uneconomical to repair" is similar. The former falls within the latter, but does not show the broader phrase, "uneconomical to repair," to be ambiguous. It is also not reasonable to equate the two without some reason to limit the reach of the phrase the Legislature has selected.

The full phrase at issue, however, is "considers it uneconomical to repair." The addition of the word "considers," if anything, emphasizes that the words "economical to repair" should be given their full breadth. Considers denotes a judgment. Combined with the phrase "economical to repair," it indicates that the rule covers the wide variety of situations that could come within the category of "uneconomical to repair."

-37-

In addition to arguing for the ambiguity of the statute, the Dealerships also raise a number of reasons -- such as the subjectivity problem -- why the Court should reject the Plaintiffs' interpretation of the statute.  These arguments are also ultimately unavailing, but the Defendants' position is particularly undermined by the changes the definition of a salvage vehicle has undergone. The interpretation that the Defendants urge the Court to accept was once part of the language of the statute.  Before the 2006 revisions, New Mexico did not have a definition of salvage per se, in the sense of listing "salvage vehicle" and defining the term.  It is an overstatement to assert, however, as the Defendants do, that before "the 2006 amendment to the registration laws, they had no definition of 'salvage vehicle.'" MSJ Reply at 8.  Rather, a salvage vehicle was defined in an operative manner.  The old statute required a salvage title to convey a vehicle "that has been damaged . . . to the extent that the cost of repairing the vehicle for safe operation on the highway exceeds its fair market value or that has been declared a total loss by the insurance company." N.M.S.A. § 66-3-10.1 (1990).  The old New Mexico law thus effectively defined salvage vehicles. This language expressing one-hundred percent rule is no longer in the statute.  The new definition of salvage vehicle is found in N.M.S.A. § 66-1-4.16(C).  Salvage vehicle is defined as a vehicle:

> other than a nonrepairable vehicle . . . that has been wrecked, destroyed or damaged . . . to the extent that the owner, leasing company, financial institution or the insurance company that insured or is responsible for the repair of the vehicle considers it uneconomical to repair the vehicle and that is subsequently not repaired by or for the person who owned the vehicle at the time of the event resulting in damage.

Id. § 66-1-4.16(C)(1).   Additionally, a salvage vehicle is one "that was determined to be uneconomical to repair and for which a total loss payment is made by an insurer, whether or not the vehicle is subsequently repaired . . . ," if certain other conditions are meet, id. § 66-1-4.16(C)(2).

The Defendants have presented no solid arguments why the New Mexico Legislature's

decision to remove the language expressly imposing a one-hundred percent rule should be understood as preserving that rule. Their first argument is that the New Mexico title laws never had a definition of salvage vehicle, so the one-hundred percent rule was never removed. As noted above, however, New Mexico law expressly used the one-hundred percent rule for determining when a vehicle required a salvage title, even if the statute did not specifically label the rule as a "definition" of salvage vehicle. Their second argument is that the amendments to the law were aimed at harmonizing the definitions of salvage vehicle and nonrepairable vehicle. See MSJ Reply at 8. This argument fails to explain why the one-hundred percent rule was not retained. The Court does not see how dropping this language would be necessary for harmonization and clarity, particularly if the Legislature intended the definition to remain the same. When a legislative revision changes a definition, the presumption is that the Legislature intended to change it. There is no legislative history indicating that, despite the plain effect of the amendment, the Legislature intended its changes to be merely cosmetic with respect to salvage vehicles.

Additionally, the various challenges that the Dealerships make to giving effect to the plain meanings of the phrase "considers it uneconomical to repair" are unpersuasive. Their principal argument is that the Plaintiffs' approach infuses the salvage process with unnecessary and problematic subjectivity. The problem with this subjectivity argument is that it assumes that a percentage rule is necessary to create an workable statutory scheme. Requiring salvage titles for vehicles that are considered uneconomical to repair, however, could broaden the protections that salvage title laws offer. By mandating salvage titles in such situations, it might very well be more difficult for potentially unsafe vehicles to escape the reach of the salvage definition. This system captures many unsafe vehicles that would not be subject to salvage titling under the one-hundred percent rule, while at the same time sweeping in some potentially safe vehicles that would not have

-39-

been subject to the old regime. Such a tradeoff between safety and avoiding unnecessary salvage titling is the sort of policy choice that a legislature can reasonably make and which a court should not try to second-guess.

The Defendants' "parade of horribles" argument is also unpersuasive. The Dealerships contend that, under the salvage regime as the Plaintiffs describe it, unsophisticated individual owners could easily run afoul of the restrictions on transferring salvage vehicles. This line of reasoning, however, misses a couple of key points. First, the only prong of the statute under which a normal owner can fall is the first prong, which requires that the vehicle be unrepaired. In other words, for a salvage title to be necessary for the transfer, the vehicle must be in a damaged state. It seems reasonable for a state to elect imposing a requirement that an unsophisticated owner who chooses to sell a damaged and unrepaired car must obtain a salvage title, even if this places some burdens on individuals. Second, the circumstances to which the worry applies are likely to be relatively rare. Most owners who have their car damaged are likely handle the situation through an insurer. To the extent that the expertise of an insurance company is not brought to bear on the situation, the statute can be understood as making a reasonable policy choice to encourage people to handle wrecks and vehicle damage with the assistance of an insurance company.

At the September 10, 2008 hearing, Mr. Hughson gave some specific examples that initially appear to give the parade of horribles argument more bite. For example, he raised the scenario of an unrepaired ding on a car door rendering the car salvage. Mr. Treinen argued that "uneconomical to repair" has become an insurance company term of art that would not cover such situations. As Mr. Hughson noted, however, the statute also applies to individuals. This case, however, involves an insurance company's determinations about a damaged Sierra. It is only the individual owner scenario that raises these concerns and, although the Court need not and will not decide the issue

because it is not before the Court, such concerns can be mitigated through other means.  For example, it many be possible to read a de minimis exception into the statute or for the MVD to pass regulations that would aid the process when a individual transfers title to a vehicle.  Additionally, it is important to read the statute as a whole.  Whether an owner considers his or her vehicle uneconomical to repair becomes an issue when the vehicle is "wrecked, destroyed or damaged . . . ."  N.M.S.A. 1978 § 66-1-4.16 (C)(1).  Under the ejusdem generis canon of construction, "damaged" would generally be interpreted as being similar to the preceding items in the list, "wrecked" and "destroyed," both of which denote severe rather than inconsequential occurrences.  In any event, the possibility that the law may be problematic in certain outlying situations does not make the law ambiguous, nor does it provide a justification for a wholesale abandonment of the plain meaning of the statute in favor of the one-hundred percent rule.

The survey of other state laws the Dealerships conduct does not aid their cause.  The statutes and cases they cite are largely distinguishable.  Many, in fact, prove the opposite point -- that states employing a one-hundred percent rule or similar percentage rule do so through language expressly providing for such a rule.  For example, Alabama specifies that a total loss occurs when an insurance company settles a claim where "a vehicle is damaged and the damage to the vehicle is greater than or equal to 75 percent of the fair retail value of the vehicle prior to damage . . . ."  Ala. Code § 32-8-87(d).  Arkansas defines a salvage vehicle as having sustained water damage or "any other damage in an amount equal to or exceeding seventy percent (70%) of its average retail value . . . ."  Ark. Code Ann. § 27-14-2301(6)(B).  In Colorado, salvage vehicle "means a vehicle that is damaged by collision, fire, flood, accident, trespass, or other occurrence, excluding hail damage, to the extent that the cost of repairing the vehicle to a roadworthy condition and for legal operation on the highways exceeds the vehicle's retail fair market value immediately prior to such damage . . . ."

Colo. Rev. Stat. § 42-6-102(17)(a).

The Court has also reviewed the statutes from the other states cited to the Court: (i) Kentucky; (ii) Louisiana; (iii) Michigan; (iv) Nevada; (v) Oklahoma; (vi) Texas; and (vii) West Virginia. Without fail, each of these seven states define a salvage vehicle, either directly or through a reference to a definition of a total-loss vehicle, using a percentage rule that is expressly laid out in the statutory language. Ten of the eleven states whose laws have been referenced thus include a percentage rule directly in their statutes, just as New Mexico did before the 2006 revisions. This pattern strongly indicates that a state wishing to have a percentage rule for salvage titles will clearly indicate so in its code.

California is the lone outlier to this general practice. In California, a percentage rule was judicially read into the definition of salvage vehicle. California's statutory language, however, has an important distinction from the similar New Mexico law. In California, a salvage vehicle is a "total loss salvage vehicle." West's Ann.Cal.Vehicle Code § 544(a). This additional qualifying language -- "total loss" -- was important to the California Court of Appeal's determination that California law contained a percentage rule, and distinguishes California's statutory scheme from New Mexico's.

Similar to New Mexico, in California, a salvage vehicle -- specifically, a total loss salvage vehicle -- is "[a] vehicle . . . that the owner, leasing company, financial institution, or the insurance company that insured or is responsible for repair of the vehicle, considers [] uneconomical to repair the vehicle . . . ." Id. The California Court of Appeal found the "Legislature's use of the term 'total loss salvage vehicle' as opposed to simply 'salvage vehicle'. . . significant." Martinez v. Enterprise Rent-A-Car Co., 13 Cal. Rptr. 3d at 861. "'Total loss'," the California Court of Appeal noted, "is commonly used to mean a 'complete destruction' of the property at issue." Id. (quoting Black's Law

Dict. (7th ed. 1999)).

The California Court of Appeal, however, also employed reasoning that favors the Dealerships' position.   The California Court of Appeal stated the normal meaning of "'uneconomical' is 'costly, wasteful,' which was in line with the definition of total loss."   Id. (quoting Webster's 3d New Internat. Dict. at 2493 (1986)).  The Martinez v. Enterprise Rent-A-Car Co. court concluded: "Logically, a vehicle is 'uneconomical to repair' when the cost of repairs exceeds the vehicle's undamaged fair market value."   13 Cal. Rptr. 3d at 861.   In support of its holding, the California Court of Appeal also cited a Michigan Court of Appeals case, Royal Auto Parts v. State, 118 Mich. App. 284, 324 N.W.2d 607 (Ct. App. 1982), that construed the phrase "uneconomical to repair" in a similar manner.   These two cases support the Dealerships' position, but the logic the cases employ is flawed.   Both cases rely on the notion that "uneconomical to repair" necessarily means that the costs of repair exceed the value of the vehicle.   This cramped definition, however, misses other possible situations where a vehicle could be uneconomical to repair.  For example, it is not economical to repair a vehicle whose value as scrap exceeds the profits that could be reaped from repairing and selling the vehicle, even though the cost of repairs relative to value does not cross the one-hundred percent line. To the extent that the California Court of Appeal relied on "total loss" as a factor limiting the expansive scope of uneconomical to repair, it employed a reasoning with which the Court can agree.   New Mexico law, however, lacks such language, and the Court finds the conflation of "uneconomical to repair" to the one-hundred percent rule to be unconvincing.

Finally, while the Court, as a federal court, is reluctant, in the interests of federalism, to find invalid a state regulation, the Court must, on the state claims, apply New Mexico law as faithfully as it can predict the state courts would.   Even if the statute were ambiguous, the regulation

expressing a one-hundred percent rule does too much damage to the language of the statute for the regulation to survive.  The arguments the Court has already laid out have even more force when the question is not just one of ambiguity, but whether the regulations reasonably interpret the statute. In particular, it is difficult for the Court to see how retaining a one-hundred percent rule that has been omitted from a statute can be a reasonable interpretation of the new statute.

In sum, N.M.S.A. 1978 § 66-1-4.16(C) cannot reasonably be read as stating the one-hundred percent rule that the Dealerships' encourage.  Instead, giving effect to the plain meaning of the phrase "considers it to be uneconomical to repair," a vehicle must bear a salvage title when an insurer, or other relevant actor as appropriate, determines that it would be economically wasteful to repair a vehicle that has been "wrecked, destroyed, or damaged . . . ."  Under this interpretation, even if the Dealerships were correct that the undisputed evidence shows that the cost of repairing the Sierra was less than its fair market value, the Plaintiffs' contention that the Sierra warranted a salvage title remains possible, because USAA could, as the Plaintiffs contend, nonetheless have considered the Sierra uneconomical to repair.  The Court will therefore deny the Motion for Summary Judgment.

**IT IS ORDERED** that the Plaintiffs' Motion for Leave to Amend Complaint is granted.  The Plaintiffs are granted leave to file their Second Amended Complaint.  The Motion for Partial Summary Judgment on Salvage and Title Washing Claims is denied.

_____
UNITED STATES DISTRICT JUDGE

-44-

*Counsel*:

Rob Treinen
Charles S. Parnall
Feferman & Warren
Albuquerque, New Mexico

 *Attorneys for the Plaintiffs*

William F. Davis
Charles R. Hughson
Brett Steinbook
William F. Davis & Assoc., P.C.
Albuquerque, New Mexico

 *Attorneys for Defendants Lomas Auto Mall, Inc.*
  *and M.D. Lohman d/b/a Lohman Motors*

Judd C. West
Michael Neill
Doughty and West PA
Albuquerque, New Mexico

 *Attorneys for Defendant Western Surety Company*

Mark J. Klecan
Klecan & Childress
Albuquerque, New Mexico

-- and --

Charles J. Vigil
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

-- and --

Robert E. Valdez
Ray, Valdez, McChristian & Jeans, PC
San Antonio, Texas

-- and --

Jeffrey W. McElroy
John Paul Valdez
Ray, Valdez, McChristian & Jeans, PC
El Paso, Texas

    *Attorneys for Defendant USAA Casualty Insurance Company*
      *d/b/a USAA*

Michael L. Danoff
Michael Danoff & Associates, P.C.
Albuquerque, New Mexico

    *Attorneys for Third-Party Defendants Independent Automobile*
      *Dealers Service Corporation, Ltd. and New Mexico Independent*
      *Automobile Dealers Association, Inc.*